Statement of the Case.
MONROE, J.
The chaotic condition of the transcript in this case has made it difficult to ascertain the real facts, and they, together with some of the evidence by which they are established, will be restated for the purposes of the present opinion:
The F. E. Creelman Lumber Company, of Cairo, entered into a contract with the Hirsch Lumber Company, of Chattanooga, whereby it agreed to sell and deliver at New Orleans to the latter company a certain quantity of cottonwood lumber, which the Hirsch Company, in turn,1 sold to the Burford Lumber Company, also of Chattanooga, subject to the condition that the Burford Company should assume its obligations under the contract with the Creelman Company.
That contract contains the following paragraph pertinent to the present inquiry, to wit: “The terms upon which we are to deliver the stock are, Cash, less 2%, or 60 days’ acceptance within ten days of invoice.” The contract was subsequently extended to cover an additional lot of lumber, amounting to 227,096 feet, which was sold by the Burford Company, before shipment from the mill, to the plaintiff's, E. B. Williams & Co., of New Orleans.
The connection of the plaintiffs and the defendant with the matter and the present situation as to all parties will be best explained by the following excerpts and narrative:
Upon February 2, 1900, the Burford Company wrote to Williams & Co.:
“We have now ready for prompt shipment 227,000 dry 1st and 2nd cottonwoods. * * * It wall all be delivered in New Orleans soon. We offer to'sell it at a low price in order to move it quick. We will take $19,000 for the 4/4 and $20 for the 5/4 and 6/4 * * *.
“We have also three cars 4/4; one, 5/4, five, 6/4, circular sawn, which we offer at the same price f. o. b. cars. * * * Kindly advise us if you can place it for us promptly,” etc.
Williams & Co. answered, offering a lower price, whereupon the Burford Company wrote February 6th:
“We will sell you the entire lot, leaving out the six cars last named, at a price of $19 f. o. b. cars, or barge, New Orleans, terms, cash upon delivery, 'which we can make within the next thirty days.”
To this, Williams & Co. replied February 9th that they were willing to close the transaction on a basis of $18.50, “ship’s side,” New Orleans, but could not do better. On February 10th the Burford Company wrote, accepting the offer thus made, and saying: “Please advise us when you want the barge delivered in New Orleans.” And this was followed by a letter from Williams & Co., in which, referring to the acceptance of their offer, they say: “This is entirely satisfactory to us and we are prepared to make prompt cash settlement immediately on arrival and inspection of the lumber.” Nothing was said during these negotiations as to-the source from or the terms on which the Burford Company had acquired or were to-acquire the lumber thus sold by them; and that company, though in the meanwhile corresponding with the Creelman Company about the shipment, had not mentioned the name of Williams & Co. Thus on February 7, 1900, the Burford Company wrote to the Creelman Company referring to J. S. Grady, who had been sent by it or by the Hirsch Company to inspect the lumber as it was loaded on the barge:
“Mr. J. S. Grady has sent us memorandum stating that you had delivered him 227,000 feet of cottonwood. You do not say where *825 you have delivered it and we beg to say that you must be familiar with the contract, that the stock is to be delivered at New Orleans and that we assume no responsibility of the lumber until it is delivered at New Orleans. Our object in keeping Mr. Grady there is to watch after and to urge that the lumber be kept separate and delivered at New Orleans without damage as per the contract, and Mr. Grady has no right or authority to receive lumber except strictly in harmony with our contract.”
To this the Creelman Company replied February lltli:
“Our understanding was that we were to deliver to you the stock in New Orleans and that you were not to assume any responsibility until it was delivered in New Orleans. But we wished to have the questions of measurement and inspection between our inspectors definitely settled before the barge was loaded, so that any difference should be adjusted while the barge was there.”
On February 16th the Burford Company wrote: “It is very difficult for us to name the wharf at which we will want the lumber delivered at this time.”
On February 26th it wrote:
“We will notify you, before the barge reaches New Orleans, where we want the stock delivered. In the meanwhile we will notify the Valley Line people, through our representative there, before we can get the information to you. * * * The cause of our inability to advise you definitely at this time is because we hope to have the barge loaded directly into the vessel.”
On March 1, 1900, the Oreelman Company wrote three letters, in part as follows: (1) To the Burford Company:
“We enclose herein the invoice for the amount of lumber received by Mr. Grady, amounting to 227,096 feet. We are advised that you have sold this lumber to Williams & Co., New Orleans, therefore we request that you have Williams & Co. pay the freight on this lumber, at the rate of $2.50 per M. feet, and deduct it from our invoice to you. * * * Kindly instruct Williams & Co. as above as we have advised a representative of the barge line of St. Louis to collect the above amount from Williams & Co. as soon as the barge arrives in New Orleans. We will thank you to send settlement for same less the amount paid for freight.”
The invoice referred to bears date February 28th, and reads:
“Sold to Hirsch Lumber Co. and Burford Lumber Co.,” and calls for a total of $3,-553.56.
(2) To Williams & Co. (after referring to some other business):
“We are advised that you have purchased from Burford Lumber Company 227,096 feet 1st and 2nd cottonwood, which we have delivered to their inspector and which is now loaded oh barge, and which will he delivered in New Orleans within a few days. The rate of freight we pay on this lumber is $2.-50 M feet, and we have instructed the Agent of the St. Louis and Miss. V. T. Co. to collect from you the above amount and have notified Burford Lumber Co. to this effect. We trust this is satisfactory to you, and that you will protect same as above. Very truly yours,” etc. (Italics by the court.)
(3) To F. W. Breedlove, who, though not so addressed, was the agent of the St. Louis & Mississippi Valley Transportation Company, as well as of the Creelman Company:
“Confirming the agreement between Mr. Creelman and yourself, beg to state that our understanding is that you will book at the lowest prices the stock we have loaded on barge 88 which belongs to us. The amount of the lumber on the barge is 227,096 feet on which we would like to have you ask Mr. Williams if he will not pay the freight, $2.50 per thousand feet, and charge the freight to us. * * * We are EOw preparing tally sheets on the balance of the stock on the barge and as soon as we have them prepared, will forward them to you, together with check for the freight. * * * The barge is now loaded and we are now simply waiting for a boat to take it down. Have the insurance policy issued to include the harbor risk in the marine risk, insuring the lumber to Antwerp,” etc.
Upon March 5th the Creelman Company ■ wrote to Breedlove:
“We have your favor of the 3rd, returning letter of Lunham & Moore, and agree with you that the rate of $3.00 a ear is out of reason, regarding booking the stock. We have just received the enclosed memorandum from them which may be of some use to *827 you in booking the cottonwood. We also enclose order on Williams & Oo. for the freight on their part of the cottonwood.”
They further refer to the fact that lumber belonging to them, as well as that shipped to the Burford Company, is loaded on the barge, and say:
“If you think it necessary to do so, you may employ the watchman on the barge to see that the lumber is separated when unloaded and we will pay the expense. We hardly think this is necessary but if you think it is use your judgment in the matter.”
The order on Williams & Co. for the freight, amounting to $567.74, is in the record, and there is also a memorandum, of even date therewith, addressed to the Burford Company, and reading as follows:
“We credit your account by order St. L. & M. Y. T. Co. upon Williams & Co., New Orleans, on account freight lumber to New Orleans 227,096' 0. wood. $2.50 per M ft. $507.74.”
The lumber in question was loaded on barge 88 consigned to “shipper’s order,” but the Creelman Company took no bill of lading for the same, and their order as to the delivery was given verbally to Mr. Breedlove, who, as has been stated, was their agent, as well as the agent of the Transportation Company. Being examined as a witness on behalf of defendant, he gives the following, among other, testimony, to wit:
“Q. Whom did you look to in regard to instructions as to the delivery of that barge? A. The shipper, Creelman & Co. Q. What were the original instructions received by you from Creelman? A. The original instructions were to deliver some 227,000 feet. Q. Were those instructions in writing? A. No, sir; I think not. Mr. Creelman was here, and the proposition was that he had sold to Burford, who, in turn, had sold to Williams & Co. That is my recollection of it. Q. Mr. Creelman sanctioned the delivery to Williams & Co., did he not? A. Well, they were to pay the freight. * *. * Q. They paid the freight? A: Yes, sir. * * * Q. When Williams & Co. came to pay the freight, did they make arrangements with you for holding the lumber for them? A. Yes, sir; I agreed that it should stay there as long as possible for their account. Q. It was at their risk and expense—put there, was it not? They had to insure it, didn’t they? A. I didn’t know anything about that. I don’t know. I mean to say, I have nothing to say about the insurance, in any direction. Q. But it was put there for their account? A. Yes, sir; they could have had it at any time. Q. Then the lumber had arrived at your fleet? A. Yes, sir. Q. That is the terminal of your line? A. Yes, sir. Q. And the freight was paid on it in accordance with the instructions of the shipper? A. Yes, sir. Q. And you held it for the account of the men who paid the freight and to whom you were ordered to deliver it? A. Yes, sir.”
The transaction referred to by the witness (that is to say, the payment of the freight by Williams & Co., and the agreement by the witness to hold the lumber for their account) took place March 15, 1900; and on the same day Williams & Co. gave to the Burford Company their check for $1,750, which was duly presented and honored, in part payment of the purchase price, and for the balance they accepted a draft for $1,780.89, “less any reclamation on a/c grade and measurement” of the lumber, which was thereupon, insured by Williams & Oo. as their property.
The expression “as long as possible,” used by Breedlove in his statement that he agreed to hold the lumber for account of Williams & Co., referred only to its storage on the barge. Mr. Williams says on that subject:
“I saw him once, when he told me he was needing his barge and desired that we release it as we promised to do when he called on us, and I then went and made arrangements with Mr. Casey Carroll, the general freight agent of the N. O. & Western Railroad, to permit me’to unload this lumber over his Chalmette wharves, and subsequently to deliver it for our account to whatever steamship we named, at a price that we agreed on for the use of the Chalmette facilities.”
This arrangement was made on March 27th, and Williams & Oo. having further agreed to pay for the towage of the barge, or part of the bill, Mr. Breedlove that night ordered that it should be sent early next morning to the Chalmette wharf, and it was so sent; and the unloading of the lumber began under the agreement between Williams & Co. and the railroad company; the latter receiving the barge, as containing lumber, and receiving the lumber, as discharged *829 upon its wharf, as the property of Williams & Co., knowing no one else in the transaction, and giving them a memorandum receipt, which, on presentation to the proper officer, was convertible into a formal certificate, upon which a bill of lading would have issued from an outgoing vessel. Mr. Dotterer, the receiver of the railroad company, defendant herein, upon March 30, 1900, after all the lumber had been unloaded upon the wharf, wrote to the attorney of Williams & Co. as follows: “In answer to your letter of even date, I hand you, enclosed, copy of a letter this day written by me to Mr. E. W. Breedlove. We consider that the lumber is in your possession and shall act upon the lines of our letter to Mr. Breedlove.”
The letter to Mr. Breedlove to which he refers reads:
“Confirming my telephone message, we desire to say that the 22?,096 feet of cottonwood lumber was unloaded on our wharf from barge S8 of the St. Louis & Mississippi Valley Transportation Company under agreement made with Messrs. E. B. Williams & Co. who delivered the lumber to us for their account, to be delivered by us to ship’s landing at that wharf. In accordance with our custom of doing business, we have given Messrs. E. B. Williams & Co. a receipt for this lumber which they are authorized to exchange for a bill of lading. We, therefore, consider the lumber as already in possession of Messrs. E. B. Williams & Co. We have no right to detain the lumber either expressly or impliedly, and we notify you that if you have any rights on the lumber you must exercise it by legal process as the matter is entirely beyond our control.”
In the course of his testimony, Mr. Dotterer states that he was mistaken in supposing that a regular certificate had been issued to Williams & Co., but that the receipt or memorandum, as issued, could have been exchanged for such a certificate. And he further testifies, in part, as follows:
“Q. The St. Louis & Mississippi Valley Transportation Company has no connection with the New Orleans & Western Railroad Company? A. None whatever. We really didn’t know the St. Louis Transportation Company. The question came up about unloading the barge of lumber on the wharf at Ohalmette, and I think Mr. E. B. Williams & Co. figured in the transaction altogether. The lumber was put there— We didn’t know about the Mississippi Valley Transportation Company, and we gave this memorandum receipt to Williams & Co.’s representative; and it would have been ended right there, only there were complications which came up afterwards which necessitated our ascertaining who the owner of the lumber was. It seemed to me that the only way to clear ourselves was to demand the surrender of the bill of lading. We took that stand, and, I think, I so advised you at the time. If the bill of lading had been surrendered by Williams & Co., instead of by Oreelman, we would have recognized their ownership in the lumber. * * * Q. Having received the lumber for account of Williams & Co., what difference did it make in regard to the bill issued by the Transportation Company? A. We received the lumber, in good faith, for account of Williams & Co., and if they had ordered that lumber within twenty-four horns, or prior to anybody advising us of the controversy, the lumber would have been delivered to Williams & Go., and have been put on the ship at Chalmette; but, before they advised us as to the disposition, they went so far as to want to load some of that lumber in cars, and we placed a car for them, and they loaded it. We' were acting in good faith. The question came up as to the ownership, and we had to stop that car—couldn’t allow it to go outside the yard, as there seemed to be a complication. Q. Why did you decide the title to the lumber, rather than let the E. E. Oreelman Company sue Williams & Co.? A. I didn’t decide that. The bill of lading decided that.”
It has already been stated that no bill of lading was issued when the lumber was shipped. No such bill had been issued when Breedlove, acting under the instructions of the shippers, and as the agent of the transportation company, received payment of the freight from Williams & Co., and agreed to hold the lumber for their account. And concerning the bill to which the witness Dotterer refers, Mr. Breedlove has this to say:
“Q. Now, was there a bill of lading issued for this lumber? A. Yes, sir. Q. How and under what circumstances was that bill of lading issued, and when? A. It was issued *831 —the date you mean it was issued, April 2d —under instructions from our home office. Q. Of what date did they instruct you to make that bill of lading? A. The date of the shipment I think it was the 8th of March.”
The bill of lading relied on by the defendant was therefore issued upon April 2d, bearing date March 8th, though in the meanwhile, to wit, upon March 15th, the property which it is now said to represent, and which had reached New Orleans, consigned to “shipper’s order,” had been delivered, by order of tlie shipper, to Williams & Co., who had paid on account of the price the sum of $2,713.14, and for the balance, of $1,780.89, had conditionally accepted a draft in favor of the Burford Company, which, by letter from the First National Bank of Chattanooga, of date March 17, 1900, they were notified ivas held by that institution as its property.
The “complication” to which the witness Dotterer refers in his testimony, and which led to the turning over by him to the Creel-man Company of the lumber received and held by him for account of Williams & Co., consisted of the fact that the Burford Company had failed to pay the Creelman Company for said lumber.
Upon March 21, 1900—six days after Williams & Co., having bought the lumber from the Burford Company, had made the payments and given the acceptance mentioned, and after Breedlove, acting by the authority of the Creelman Company, the transportation company and the Burford Company, had agreed to hold the lumber for the account of Williams & Co.—the following correspondence took place by telegraph (we transcribe it verbatim et literatim et punctuatim):
The Creelman Company wired the Bur-ford Company:
“Have you sent settlement cottonwood. We must have it immediately.” The Bur-ford Company replied: “Awaiting notice of delivery from Williams before taking up your matter.” The Creelman Company then wired the Hirseh Company: “On one pretext or another, Burford refuses payment cotton wood barge delivered Williams accept paid freight we want settlement immediately wire answer here.” To this the Hirseh Company answered: “Burford says waiting report from Williams that all lumber invoiced by you is there. He don’t want to pay for more than Williams gets.” And the Creelman Company replied: “Burford’s inspectors saw all lumber loaded and receipted for same barge delivered Williams your contract calls for settlement within ten days date of invoice. We expect you to keep agreement and insist you send settlement to Cairo immediately.” There was then some correspondence by mail, and on March 26th the Creelman Company wrote to the Burford Company, in part, as follows: “We have your favor of the 24th and we have to state that you have a very lame excuse for delaying settlement on this barge. We have nothing whatever to do with your delivering the lumber to Williams &' Co. Williams & Co. are not known in this transaction to us, and we do not care whether or not you deliver a single board to them. Your inspector receipted for every foot of lumber which was put on this barge and we now hold his receipt. * * * We do not care how much lumber Williams & Co. measure off this barge. It is immaterial to us, and we do not care to consider it at all. We, therefore, ask that you send us settlement for the barge at once. The time has elapsed and the account is now overdue.”
On the same day (March 26th) Creelman wired Breedlove: “Please wire me fully, to Vicksburg, what position Williams takes regarding lumber; unless lumber accepted and settled for will not deliver, if you will wire me fully, may save me trip to New Orleans.” And Breedlove replied (March 27th): “Williams has arranged to take delivery. Will discharge his lumber to-morrow, weather permitting. Will forward receipt to Cairo when obtained.” On March 28th, Breedlove wired Creelman: “Advise you come Orleans at once about this cottonwood.” On March 29th he wrote to the New Orleans & Western Railroad Oomi>any:
“We are now unloading some 227,096 feet cotton wood lumber ex our barge #88. Since commencing to discharge this lumber, a controversy has arisen over the shipment, we beg to notify you to hold the shipment subject to our order for account and risk of whom it may concern.”
And on the following day he received the reply from the defendant (received of the road) which has been quoted, saying that *833 the lumber was held for account of Williams & Co. Upon April'2d, however, F. E. Creelman, representing the lumber company of that name, arrived in New Orleans, and, finding an employé of Williams & Co. inspecting the lumber on the Chalmette wharf, notified him to let it alone—that it belonged to the Creelman Lumber Company. Testifying, he says: “I returned to New Orleans and called on Mr. W. C. Dotterer, receiver of the New Orleans & AVestern Railroad Company, presented to him the bill of lading for the barge, and demanded the delivery of the lumber contained on the barge to the F. E. Creelman Lumber Company, under the bill of lading, and the lumber was delivered to us under the bill of lading.”
The witness does not explain that the bill of lading was issued on that day (April 2d), antedated March 8th. On April 3d the receiver wrote to Williams & Co.: “Beg to say that I now have in my possession original B/L showing that lumber was shipped by the F. E. Creelman Lumber Co., consigned to shipper’s order, New Orleans. Therefore, as the matter now stands, we only know the shipper.”
On the following day the attorney representing the Creelman Company addressed a letter to the receiver, reading:
“As attorneys for the F. E. Greelman Lumber Co. we hereby give you peremptory orders of stoppage in transitu of barge load of cottonwood lumber, unloaded from barge No. 88 of the St. Louis & Mississippi Valley Transportation Company and now on your wharf, in transitu to ship’s side. The F. E. Creelman Lumber Co. are the vendors of this lumber and they have not been paid the price thereof, and exercise this right of stoppage in transitu, the purchaser having positively refused to pay the price.”
In the meanwhile, or, rather, upon the same day (April 4th) that this letter was written, the present suit was filed by Williams & Co., claiming the lumber, and praying that Dotterer, receiver, and F. E. Creel-man be cited: that a writ of injunction issue, restraining the receiver from delivering the lumber to any one other than petitioners, restraining Creelman from interfering with their control of the same; and for judgment ordering the receiver to restore the lumber to their possession, or pay them $5,000, together with $50 per day until it should be restored. The plaintiffs, however, failed to furnish bond, and the preliminary injunction was refused. Creelman was released from plaintiffs’ claim on an exception of “no cause of action” filed by him, and the case was put at issue as between the plaintiffs and the receiver. Thereafter, upon the surrender to him of the bill of lading, such as it is, and upon their giving bond to hold him harmless, the receiver delivered the lumber to the Creelman Company, who shipped it to Europe for their own account. ■
For answer to the claim made by the plaintiffs, the receiver avers “that the true facts' in regard to the lumber claimed by the plaintiffs are as follows: Barge-No. 88, laden with cottonwood lumber, said to contain about 227,090 feet, more or less, was delivered at the wharves of the New Orleans & AVestern. Railroad Company, now in possession and control of this defendant, as receiver, with the statement by the Mississippi Valley Transportation Company that said lumber was for delivery to the plaintiff in this case; that, after the arrival of said lumber at said wharf, and while the same was in progress of being unladen, the wharf keeper handed the plaintiff, at his request, a receipt for said lumber; that shortly thereafter the defendant received notice from the Mississippi Transportation Company, the carrier of said lumber, who had delivered the same to this defendant, not to deliver the same to the plaintiff, for the reason that the plaintiff was not the owner thereof, and was not entitled to the delivery thereof.”
He avers that he took the position that, he would not deliver the lumber to any one, and notified the parties in interest that, if he was not relieved within 48 hours, he would bring suit against them to have the matter determined; that he then received from the Creelman Company notice of stoppage in traDsitu, and subsequently, the plaintiffs failing to sequester the lumber, and the Creel-man Company tendering him a bond to defend and hold him harmless, the lumber was delivered to it. He further avers that he *835 investigated, and found that the plaintiffs Were not the owners of the lumber, having never paid for the same, and that it was the property of the Creelman Company, unpaid vendor, who held bills of lading therefor directing the delivery of the lumber to its order. He prays that the Creelman Company be called in warranty, and for judgment, etc. No citation in warranty seems to have been served on, and no answer has been filed by, the Creelman Company. The understanding, however, seems to be that it is the real defendant, and will respond to any judgment that may be rendered against the receiver.
Opinion.
It is evident from the foregoing that, under the original contract between the Creel-man and the Hirsch Companies, assumed by the Burford Company, the latter had the option, upon the delivery of the lumber to it, of paying for it in cash, with 2 per cent, off, or by acceptance, at CO days, within 10 days from the 8th of March; i. e., up to the 18th of March. The lumber was consigned to “shipper’s order.” Breedlove testifies that he was ordered by the shipper to deliver it, and it is nowhere intimated that he was originally instructed to exact the payment of the purchase price in advance of such delivery. If a bill of lading had been taken, the delivery would have been made by its surrender. As there was no bill of lading, the delivery was to have been, and was, effected by the delivery of the lumber itself. More than this, the Creelman Company knew that the Burford Company, whom it had accepted as vendee, had sold the lumber to Williams & Co.; it knew that, the Burford Company consenting, it would be delivered to Williams & Co., and that it might be delivered directly from the barge into an outgoing ship, as the property of Williams & Co., consigned to their vendees abroad; and, knowing this, it made no effort to inform itself whether Williams & Co. were paying cash, or were buying on terms of credit, or to stop, in their hands, the payment of the price, save so much of it as was represented by the freight money, which it requested Williams & Co. to pay to the barge line, thereby, however, assenting to and ratifying the sale by the Bur-ford Company to Williams & Co., and the delivery to the latter of the lumber. Breed-love, acting under the authority of the shipper, who had sold the lumber to the Burford Company, and under the authority, of the Burford Company, who had sold it to Williams & Co., upon the payment by the latter of the freight money, delivered the lumber to them, upon March 15, 1000, „and agreed to hold it for them account, and to allow it to remain stored on the barge as long as he conveniently could. In addition to the $567.74 of freight money paid by them on that day, which was at once credited by the barge line to the account of the Creelman Company, Williams & Co., as a further payment on the purchase price, gave their check, which was promptly cashed, to their vendor, the Bur-ford Company, for $1,750, and for the balance of the price they gave the Burford Company a conditional acceptance for $1,780.89, which the Burford Company turned over to the First National Bank of Chattanooga. Some 10 or 12 days later, Breedlove notified Williams & Co. that he needed his barge, and that, unless thoy moved their lumber, he would charge them demurrage; and they accordingly had the barge towed some 8 or 10 miles down the river, and the lumber discharged upon the Chalmette wharf of the New Orleans & Western Railroad Company, under an arrangement (to which the barge line was not a party) whereby the receiver of the railroad company was to hold it as their agent and for their account, to be delivered on shipboard, or otherwise, as they might order.
Under these circumstances, and after Williams & Co. had thus bought and obtained possession of the lumber, the efforts of the Creelman Company to prevent its delivery to them, including the obtention from the barge line of the antedated bill of lading, and the service on the receiver of the railroad company of the notice of stoppage in transitu, were, to say the least, useless acts, for the Creelman Company, having placed the Bur-ford Company in a position to sell and deliver the lumber to Williams & Co., are in no position to say that the sale and delivery accepted by Williams & Co. are without effect; nor could the Burford Company, having made such sale and delivery, be heard to say that they had not received the lumber from the Creelman Company.
Our conclusion, then, is that the lumber in *837 question belonged to the plaintiffs, was held by the’ defendant as their bailee, and was disposed of by him without right or authority, and that, it being no longer within his power to restore it, the only question which remains is, for what amount of money should he be condemned?
The alternative demand of the petition is for $5,000, and $50 a day as damages until the lumber is delivered. In the original brief filed on behalf of the plaintiffs, their counsel, figuring upon the basis of a contract which the plaintiffs had made for the sale of the lumber at $30 per thousand, less costs, insurance, and freight, place their claim at $4,S93.G9; these figures being obtained by calculating the value of the entire lot of lumber, at $30 per M, and deducting certain amounts therefrom, as representing the costs, insurance, and freight. We are unable, however, to accept this result. For, whilst the evidence shows that the plaintiffs had made a contract for the delivery during the year 1900 of cottonwood lumber in Antwerp at $30 per M feet (c. i. f.), it fails to establish the loss on that contract which is" here claimed; and they have not paid, and, in all probability, will not be called on to pay, the $1,780.89 of the purchase price of the lumber which is represented by the conditional acceptance given by them. Under all the circumstances of the case, therefore, we are of opinion that the ends of justice will be best subserved by awarding the plaintiffs judgment for the amounts actually disbursed by them, and reserving their rights with respect to possible further liability on account of the transactions out of which this litigation has arisen.
It is therefore ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs, E. B. Williams & Oo., and against the defendant, W. C. Dotterer, receiver of the New Orleans & Western Railroad Company, in the sum of $2,317.74, with legal interest thereon from March 15, 1900, until paid; that the right of the plaintiffs hereafter to recover from said defendant the further sum of $1,780.89 (represented by an outstanding contingent acceptance given by them to the Burford Lumber Company), in case they should be held liable therefor, be reserved; and that in all other respects their present demand be rejected; the said defendant to pay all costs.
See dissenting opinion of BREAUX, J., 35 South, 927.